IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

SEPTEMBER 1997 SESSION



**FILED**

**May 1, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | |
|---|---|
| STATE OF TENNESSEE )<br><br>Appellee, )<br><br>v. )<br><br>WILLIAM ROBERT DIAZ )<br><br>Appellant ) | NO. 03C01-9610-CC-00375<br><br>ANDERSON COUNTY<br><br>HON. JAMES B. SCOTT, JR.<br><br>(2nd Deg. Mur. & Att. Mur.) |

For the Appellant

J. Thomas Marshall, Jr.
District Public Defender
101 South Main Street, Ste. 450
Clinton, TN. 37716

For the Appellee

John Knox Walkup
Attorney General & Reporter

Timothy F. Behan
Assistant Attorney General
425 Fifth Avenue North
2nd Floor Cordell Hull Building
Nashville, TN. 37243-0493

James N. Ramsey
District Attorney General

Janice G. Hicks
Assistant District Attorney General
127 Anderson County Courthouse
Clinton, TN. 37716

OPINION FILED:_____

AFFIRMED

WILLIAM M. BARKER, JUDGE

**OPINION**

The appellant, William Robert Diaz, appeals as of right the convictions and sentences he received in the Criminal Court of Anderson County. After a jury trial, the appellant was convicted of second degree murder and attempted second degree murder and was sentenced as a Range I standard offender to twenty-two (22) years for the murder and to twelve (12) years for attempted murder.[1] The sentences were ordered to be served concurrently.

On appeal, the appellant contends that: (1) The trial court erroneously allowed his pretrial statements to be admitted into evidence; (2) The evidence at trial was insufficient to sustain his convictions; (3) The trial court erred in limiting the testimony of defense witness, Raymond Mitchell; and (4) The trial court erred in sentencing him to twenty-two (22) years for second degree murder and to twelve (12) years for attempted second degree murder.

After a review of the record, we affirm the judgment of the trial court.

**FACTUAL BACKGROUND**

On June 19, 1994, the appellant shot his former girlfriend, Linda Arthur, and her twenty two-year-old daughter, Terri White, with a .22 caliber revolver. Ms. Arthur survived with extensive injuries to her face; however, Ms. White died almost immediately from a gunshot wound to the head. The facts surrounding the shooting are sharply disputed between the appellant and Ms. Arthur.

Ms. Arthur testified that she became romantically involved with the appellant in 1990 after she began working for his engineering consulting business.[2] The two maintained their personal and professional relationship for several years before eventually moving to Clinton, Tennessee in 1992. Following their move to Tennessee,

---

[1] The appellant was indicted on the charges of first degree murder and attempted first degree murder.

[2] The appellant operated his own business as an engineering consultant after he received training at Aiken Technical College in Aiken, South Carolina, and the University of South Carolina.

they formed a small corporation, Lintech Nuclear, Inc., and began conducting various contract and temporary agency work. Ms. Arthur served as president of the corporation and lived with the appellant in a house financed under the corporation name. Although the appellant and Ms. Arthur purchased an engagement ring and planned to get married, they were not married at the time of the shooting.

According to Ms. Arthur, she had planned a cookout for the appellant on June 19, 1994, because appellant's two children, Larry and Roger, were visiting for Father's Day.[3] The appellant spent the day working in the yard and watching movies with his two sons while Ms. Arthur relaxed on the patio. The appellant visited with his children until after dark and eventually went to bed around 9:30 p.m..

Ms. Arthur testified that shortly thereafter, she began moving stereo speakers back into the living room from the patio. While cleaning up the living room, she accidently turned on the stereo inside the house and woke the appellant from his sleep. According to her testimony, the appellant walked out of his bedroom and smashed the stereo onto the floor. When Ms. Arthur asked him what was wrong, he grabbed her by the throat, pushed her out onto the deck, and slammed her against the deck railing. Ms. Arthur testified that the appellant told her, "I could kill you right now, you mean nothing to me."[4]

Following that outburst, the appellant went back inside the house and sat down on his bed. Ms. Arthur testified that she asked the appellant to take her to a nearby hospital; however, the appellant refused because he had been drinking alcohol and did not want to drive. According to Ms. Arthur, the appellant appeared angry and frustrated, however, he did not show signs of intoxication. She testified that he

---

[3]The record is unclear as to the ages of the appellant's two children on the date of the shooting. However, there was evidence that appellant's youngest son, Larry, was twelve or thirteen and that both boys were in the custody of their mother.

[4]The State sought to prove that the appellant had threatened to kill Ms. Arthur before June 19, 1994. The appellant's neighbor, Randall Sharp, testified that he overheard the appellant say he was going to kill Ms. Arthur, a few months before the shooting.

grabbed the bedpost and pulled the bed apart in anger before leaving the house with his son, Larry.

A short time later, the appellant returned to the house accompanied by Ms. Arthur's daughter, Terri White. Ms. White agreed to take Ms. Arthur to the hospital and the three discussed the arrangements in the living room. Ms. Arthur testified that the appellant and Ms. White began arguing after Ms. White expressed disapproval of the appellant's treatment of her mother. According to Ms. Arthur, the appellant said, "Wait a minute, I want to show you something." The appellant thereafter retrieved his .22 caliber pistol and returned to confront the two women.

Ms. Arthur testified that she overheard Ms. White say, "You ought to use that on yourself, Bill," as the appellant took aim at Ms. White. When the appellant first pulled the trigger, the pistol clicked but did not fire. The appellant pulled the trigger a second time and the weapon fired a bullet into Ms. White's forehead. Thereafter, the appellant turned the gun on Ms. Arthur and fired a final shot. The bullet struck Ms. Arthur in the face as she was moving towards her injured daughter.

Randall Sharp, a neighbor who lived nearby the appellant's house, testified that although he did not hear the gunshots, he received a visit from the appellant around 10:15 p.m. that evening. According to Mr. Sharp, the appellant appeared to be frantic and he admitted to Mr. Sharp that he had shot Ms. Arthur and Ms. White. Mr. Sharp testified that he immediately went to appellant's house to check on the two victims. He administered CPR to Ms. White; however, she did not respond.

The appellant testified in his own defense that he never pointed the gun at Ms. Arthur or Ms. White. He stated, instead, that he turned the gun upon himself because his relationship with Ms. Arthur and Ms. White had become overbearing. According to the appellant, Ms. Arthur was demanding and manipulative and often became violent

4

when he acted against her wishes.[5]  He testified that a few weeks before the shooting, Ms. Arthur began fighting with him frequently about his two children, his ex-wife, and his alleged infidelities.  He further indicated that he was afraid of Ms. Arthur and that he tried to leave her on several occasions; however, she stopped him and forced him to return home.[6]

The appellant testified that on June 19, 1994, he spent the day working in the yard with his two children while Ms. Arthur sun bathed on the patio.  He stated that he did not have much contact with Ms. Arthur that day until he went to bed around 9:30 p.m..  According to the appellant, Ms. Arthur began entering his bedroom to argue and to interrupt his sleep.  He testified that he got up and moved to different rooms in the house; however, she followed him around and eventually cornered him in his bedroom.

At that point, the appellant decided to leave the house with his son, Larry.[7]  He testified that as he moved past Ms. Arthur in the bedroom, he hit the bedpost and broke the bed accidently with his shoulder.  He stated that Ms. Arthur then grabbed him from behind and knocked him into the stereo equipment.  As he made his way towards the front door, he pushed Ms. Arthur away from him several times and eventually forced her backwards into the deck railing.  Thereafter, he left the house and took his son, Larry, to Ms. White's apartment.

The appellant testified that when he arrived at Ms. White's residence, he explained to her that he and Ms. Arthur had been fighting.  Ms. White decided to accompany him back to the house and the two drove separately after the appellant left

---

[5]Ms. Arthur's ex-husband, Tony Arthur, testified for the defense that Ms. Arthur had a propensity for violence and that she often screamed and threw objects at him.  He testified that on one occasion, she threw hot coffee on him after he refused her demand for money.  He stated that although he retaliated by striking her with his fist and knocking her down, she immediately got up and assaulted him with a hot curling iron.  Ms. Arthur denied that she ever attacked her ex-husband.

[6]The appellant testified that on several occasions, Ms. Arthur pulled a gun on him to prevent him from leaving the house.

[7]Apparently, the appellant's other son, Roger, had already left the house to stay with Terri White at her nearby apartment.

5

Larry at the apartment. According to the appellant, both Ms. Arthur and Ms. White began accosting him after they returned to the house. He stated that he attempted to exit through the garage; however, Ms. White cut him off and pushed him backwards over the stereo.

The appellant testified that while laying on the floor, he noticed his .22 caliber revolver positioned on top of a furniture chest.[8] He returned to his feet and grabbed the weapon saying, "I'll get out of this house one way or another." The appellant testified that, in desperation, he pointed the gun at his head and pulled the trigger. When the gun merely clicked, he pulled the trigger again and fired a bullet striking Ms. White in the head. He stated that he was aiming at himself and never intended to shoot Ms. White. He admitted though that he fired a final shot striking Ms. Arthur in the face.[9]

Ms. Arthur spent almost a week in the hospital. Upon her return home, she found the words, "Linda is dead," written in dust on the side of a bedroom dresser. No evidence was introduced as to the author or the date of the words. Police investigators testified that they did not discover or examine the writing until after Ms. Arthur returned home from the hospital.

Based upon the above evidence, the appellant was convicted and sentenced to twenty-two (22) years for second degree murder and to twelve (12) years for attempted second degree murder. On appeal, he challenges both his convictions and sentences.

## I.

The appellant first contends that the trial court should have suppressed his pretrial statements made after he invoked his right to counsel. He argues that after requesting the aid of counsel, he was subjected to further police interrogation in

---

[8]The appellant testified that he normally kept his pistol fully loaded in the bedroom closet. He stated that he did not know why it was positioned on the furniture chest in the living room.

[9]The appellant testified he did not know why he fired the final shot, but that he immediately tried to call 911. When his phone malfunctioned, he ran to a neighbor's house.

violation of <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981).

This issue is without merit.

On the morning after the appellant's arrest, he was questioned by Lieutenant Penny Baker and Sergeant Bill Breeding of the Anderson County Sheriff's Department.  Lieutenant Baker informed the appellant of his *Miranda* rights and inquired as to his level of education.[10]  The appellant responded that he had sixteen years of education and that he should not be in jail for something that was not his fault.  When Sergeant Breeding asked the appellant if he wanted to discuss the case, appellant responded that maybe he should have an attorney.  Both officers immediately ceased their questioning and Lieutenant Baker called for a jailer to return the appellant to his cell.

While Lieutenant Baker corresponded with the jailer, the appellant spoke up and again said that he was going to jail for something that was not his fault.  Sergeant Breeding asked the appellant if he wanted to discuss the case and appellant indicated that anything he said could be used against him in court.  Both officers re-informed the appellant that his statements could be used against him and that he had a right not to talk.  However, they explained that if he remained silent, they would have to establish a case on other collected evidence.  Lieutenant Baker further stated that if appellant chose to explain his version of the case, she and Sergeant Breeding were willing to listen.  At that point, the appellant discussed his relationship with Ms. Arthur and his involvement in the shooting.

Prior to trial, the appellant filed a motion to suppress his statements on the ground that his *Miranda* rights had been violated when the two officers questioned him after he invoked his right to counsel.  Both officers testified that although they believed the appellant had invoked his right to counsel, they insisted that he initiated the

---

[10]The appellant's *Miranda* rights were read from a rights waiver form.  However, during his interview with Lieutenant Baker and Sergeant Breeding, the appellant never signed that form.

subsequent dialogue and questioning. The trial court determined that even if the appellant triggered his right to counsel during the interview, he thereafter waived his right both knowingly and voluntarily when he began commenting about the case.[11]

The appellant contends that he did not initiate any further discussion or questioning after he invoked his right to counsel. He argues that Lieutenant Baker and Sergeant Breeding should have ceased all questioning until counsel was made available to him.

The appellant relies upon the landmark case of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, L.Ed.2d 378 (1981). In Edwards, the United States Supreme Court held that when an accused invokes his right to counsel under *Miranda*, all police interrogation must cease until counsel is made available or the accused himself initiates further communications with the police. See id. at 1884-85. Under Edwards, the first inquiry is whether the accused invoked his right to counsel. See Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984).

Although there is no bright-line rule concerning when an accused invokes the right to counsel, the United States Supreme Court has held that an accused must articulate his desire to have counsel present unambiguously and sufficiently clear so that a reasonable police officer in the circumstances would understand the statement to be a request for counsel. See Davis v. United States, 512 U.S. 452, __, 114 S.Ct. 2350, 2355 (1994); State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). "If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect." See Davis, 114 S.Ct. at 2355.

---

[11]The trial court addressed the appellant's motion to suppress both under the Sixth Amendment and Fifth Amendment right to counsel. We acknowledge, however, that the right to counsel under the Sixth Amendment is not applicable in this case. That right does not attach until the adversarial judicial process has begun. See Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986); State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). In Tennessee, the adversarial judicial process is initiated "at the time of the filing of the formal charge, such as an arrest warrant, indictment, presentment, or preliminary hearing in cases where a warrant was not obtained prior to arrest." See Huddleston, 924 S.W.2d at 669. When the appellant made his statement, he had not been formally charged.

In the case *sub judice*, both Lieutenant Baker and Sergeant Breeding admitted that when the appellant stated, "Maybe I should have an attorney," they reasonably believed that he was invoking his right to counsel. At that point, they ceased their questioning and made arrangements to return the appellant to his cell. We agree that the appellant's statement was sufficient to invoke his right to counsel. See State v. Furlough, 797 S.W.2d 631, 639 (Tenn. Crim. App. 1990), *per. app. denied* (Tenn. 1990).

The dispositive issue, therefore, is whether the two officers complied with Edwards after the appellant requested an attorney. The record reveals that the appellant was never provided counsel during his interview with Lieutenant Baker and Sergeant Breeding. Accordingly, we must determine whether the appellant initiated further discussions with the two officers, and knowingly and intelligently waived his right to counsel. See Smith v. Illinois, 105 S.Ct. at 493.

After a careful review of the record, we find that the appellant reopened further discussions with the two officers after he invoked his right to counsel. The evidence reveals that before any police interrogation resumed, the appellant stated, "I am going to jail for something that is not my fault." Appellant's comment related to his culpability in the shootings and prompted Sergeant Breeding to ask if the appellant wanted to talk. The two officers then informed appellant of his *Miranda* rights a second time before he made any further statements about the case.

We agree with the trial court's finding that the two officers refrained from coercing the appellant or acting in a manner to overbear his free will. The appellant had sixteen years of education and was fully capable of intelligently deciding whether or not to make a statement. He expressed understanding that his words could be used against him and he was further informed that he did not have to talk. Based upon the totality of the circumstances, we conclude that the appellant voluntarily and

intelligently waived his right to counsel. Therefore, the trial court properly allowed his statements into evidence.

## II.

The appellant next contends that the evidence was insufficient to sustain his convictions of second degree murder and attempted second degree murder. He argues that the evidence fails to prove the necessary *mens rea* for the convicted offenses.

This issue is without merit.

When a defendant challenges the sufficiency of the convicting evidence, he has the burden of demonstrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact. We do not reweigh or re-evaluate the evidence and must afford the State the strongest legitimate view of the proof contained in the record, including all reasonable and legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Under that inquiry, we must determine whether "any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as any factual issues raised by the evidence are resolved by the trier of fact, not this Court. See Cabbage, 571 S.W.2d at 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

In this case, although the facts were disputed between the appellant and Ms. Arthur, the jury found that the appellant was guilty of second degree murder and attempted second degree murder. The jury's verdict accredits the testimony of the State's witnesses, including Ms. Arthur, and requires this Court to resolve any conflict

10

in favor of the State. We find that there was more than sufficient evidence to warrant the appellant's convictions.

To sustain the verdict of second degree murder, there must be proof in the record that the appellant knowingly killed Terri White. See Tenn. Code Ann. § 39-13-210(a)(1) (Supp. 1994). Tennessee Code Annotated section 39-11-302(b) provides that a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result."

The evidence in this case reveals that the appellant shot Ms. White in the head at close range during a confrontation at appellant's house. The appellant admitted that he kept his pistol loaded and that he pulled the trigger twice before the weapon fired a bullet into Ms. White's forehead. Although he claimed that he was pointing the gun at himself, there was sufficient proof for the jury to find that he took aim at Ms. White each time he pulled the trigger. Viewing the evidence in a light most favorable to the State, we conclude that the appellant fired the weapon with knowledge that his conduct would cause the death of Ms. White.

The evidence also reasonably supports a finding that the appellant attempted to kill Ms. Arthur. To sustain that conviction, there must be proof that the appellant acted knowingly to commit the offense of second degree murder and that he engaged in intentional conduct or course of action constituting a substantial step towards the commission of second degree murder. See Tenn. Code Ann. § 39-12-101(a)(3) (Supp. 1994). Conduct does not constitute a substantial step unless the appellant's entire course of action is corroborative of the intent to commit the particular offense.

The appellant does not dispute that he shot Ms. Arthur in the face immediately after he fatally wounded Ms. White. He argues instead that his conviction is inappropriate because criminal attempt requires intentional action whereas second degree murder requires a "knowing" mental state. Appellant, however, cites no authority for his proposition and fails to acknowledge that, as in this case, a person

11

can intentionally engage in a course of action or conduct that constitutes a substantial step towards the knowing killing of another.[12]

The evidence reflects that the appellant pulled the trigger of his loaded pistol three times during his confrontation with the two victims. Ms. White was the first person to be struck by a bullet before the appellant ultimately turned his gun upon Ms. Arthur. Although appellant testified that he did not know why he shot Ms. Arthur, the evidence sufficiently demonstrates that he intentionally pulled the trigger of his pistol and shot Ms. Arthur in the face. A reasonable jury could have determined that the appellant intended to shoot Ms. Arthur with knowledge that his action would likely cause her death.

### III.

The appellant next contends that the trial court erred in limiting the testimony of defense witness, Raymond Mitchell. He argues that Officer Mitchell should have been allowed to testify concerning alleged threats that Mitchell heard during a telephone conversation with a member of the victims' family.

This issue is without merit.

Raymond Mitchell, a jailer at the Anderson County jail, placed a phone call to the victims' family before the appellant was released on a pre-trial bond. During that call, Officer Mitchell heard a member of the victims' family threaten to harm the appellant if he were released from custody. Officer Mitchell, thereafter, took several precautionary measures for the appellant's safety upon his release.

The appellant called Officer Mitchell to testify concerning the alleged threats that he heard during the telephone conversation. Although the trial court allowed Mitchell to describe his reactions and safety measures taken after the call, the court

---

[12]This Court has previously upheld convictions for attempted second degree murder. See State v. Freeman, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996), *per. app. denied* (Tenn. 1997); State v. Boyd, 909 S.W.2d 50, 54-55 (Tenn. Crim. App. 1995).

12

ruled that Mitchell's testimony concerning the alleged threats was inadmissible hearsay.

The appellant contends that the trial court should have allowed the statements into evidence on non-hearsay grounds. He argues that the statements were not offered for their truth, but instead were offered to show the effect on the listening officer.

Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. See Tenn. R. Evid. 801. When a statement falls under the hearsay definition, Rule 802 of the Tennessee Rules of Evidence operates generally to exclude it on the basis of its inherent unreliability. However, in cases where the out-of-court statement is not offered for its truth, the statement is non-hearsay and does not fall under the exclusionary rule. See N. Cohen et al, *Tennessee Law of Evidence* §§ 801.6, 801.7 (3d ed. 1995).

In this case, there was no indication that the appellant sought to prove the substantive truth or falsity of the alleged threats. Instead, he contends that the statements were relevant to demonstrate the animosity felt towards him by the victims' family.[13] According to the appellant, the statements supported his theory that a member of the victim's family wrote, "Linda is dead" on the bedroom dresser.

If the statements were relevant on that basis, we find that they would have been admissible as non-hearsay to circumstantially prove the declarant's state of mind. See N. Cohen et al, *supra*, § 801.7. However, in this case, the probative value of the statements was speculative and minimal at best. The appellant offered no proof concerning the identity of the declarant or the possible link between the statements and the words on the dresser. Any theory that the unidentified declarant or a member of the victims' family wrote the message in the dust is shear speculation

---

[13]The appellant argues that the statements were admissible to show the effect on Officer Mitchell. However, he admits that he intended the statements to reveal the ill feelings harbored by the victims' family.

and conjecture. Given the amount of evidence against the appellant, we conclude that any error in the exclusion of the statements was harmless indeed. <u>See</u> Tenn. R. App. P. 36(b); Tenn. R. Crim. App. 52(a).

**IV.**

The appellant next contends that the trial court erred in sentencing him to twenty-two (22) years for second degree murder and to twelve (12) years for attempted murder. He argues that the trial court failed to articulate the applicable enhancing and mitigating factors and that his sentences are excessive.

Although the trial court failed to indicate the enhancement and mitigating factors relied upon at sentencing, we conclude that the record supports appellant's sentences on both convictions.

When a defendant complains of his sentence, we must conduct a *de novo* review of the record. <u>See</u> Tenn. Code Ann. § 40-35-401(d) (Supp. 1994). The sentence imposed by the trial court is accompanied by a presumption of correctness and the appealing party has the burden of showing that the sentence is improper. <u>See</u> Tenn. Code Ann. § 40-35-401 (Sentencing Commission Comments). However, the presumption of correctness is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. <u>See</u> <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

The record in this case fails to show that the trial court considered the sentencing principles and all relevant facts and circumstances. Accordingly, our review is *de novo* without a presumption of correctness. <u>See</u> <u>Ashby</u>, 823 S.W.2d at 169; <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

Tennessee Code Annotated section 40-35-210 contains specific procedures for sentencing and requires consideration of the following: (1) evidence from the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments concerning sentencing alternatives; (4) the nature and characteristics

14

of the offense; (5) information offered by the State or the defendant concerning enhancing or mitigating factors; and (6) the defendant's statements in his own behalf about sentencing.

Moreover, under section 210, the trial court "must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence." See State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). Tenn. Code Ann. § 40-35-210(f) (Supp. 1994).

Those findings must be recorded to facilitate an adequate review on appeal. However, as both the State and appellant agree, the trial court in this case made no specific reference to the enhancing and mitigating factors. Moreover, the record is silent as to any factual findings used to establish the appellant's sentences. Nevertheless, we find sufficient evidence in the record to address the appellant's sentences *de novo*.

At the sentencing hearing, the State argued for the application of two enhancement factors: (1) the defendant employed a firearm during the commission of the offenses; and (2) the personal injuries inflicted upon the victim, Linda Arthur, were particularly great. Tenn. Code Ann. § 40-35-114 (9), (6) (Supp. 1994). In addition to relying upon the evidence presented at trial, the State called Ms. Arthur to testify about the extent of her injuries. She testified that the bullet wound caused her pain and permanent nerve damage to her face. Although she underwent two surgeries following the shooting, she suffered partial vision impairment in one eye and random spells of nausea and dizziness. She further indicated that she must remain under the care of her doctors and that the bullet has never been extracted.

The appellant testified at the hearing and argued that the following mitigating factors were established by the record: (1) he acted under strong provocation; (2)

substantial grounds existed tending to excuse or justify his criminal conduct; (3) he was suffering from a mental condition that significantly reduced his culpability for the offense; (4) he assisted authorities in treating the victims after the crime; (5) he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct; (6) he acted under duress or under the domination of another person, even though the duress or domination is not sufficient to constitute a defense to the crime; and (7) he had no prior criminal record. Tenn. Code Ann. § 40-35-113 (Supp. 1994).

The appellant testified that although he experienced pain after the shooting, he never felt guilt for his actions. He stated that Ms. Arthur and Ms. White were the aggressors during the crime and that he was merely trying to get away. Furthermore, he indicated that he prayed for Ms. Arthur and her family even though she manipulated and abused him.

Appellant also relied upon the testimony of his former employer, Martin Jamison, and character letters from past co-workers. Mr. Jamison corroborated information in the letters that the appellant was a valuable employee who maintained a positive attitude towards his colleagues. Mr. Jamison admitted on cross-examination, however, that he had very little knowledge of the appellant's behavior outside of work. Additionally, while the character letters described appellant's demeanor at work, they provided little information about his relationship with Ms. Arthur and Ms. White.[14]

In conducting our *de novo* review, we have considered the evidence from trial and the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, the appellant's personal statements, and information offered on enhancement and mitigating factors. Tenn.

---

[14]We acknowledge that two letters submitted by appellant's former co-workers, Gordon Goos and Geneva West, indicate that the appellant was manipulated and harassed by Ms. Arthur. However, no evidence was presented at sentencing to establish the basis or credibility of those letters.

16

Code Ann. § 40-35-210(b) (Supp. 1994). There is no dispute that the appellant was properly sentenced as a Range I standard offender. Accordingly, the appropriate range of his sentences is fifteen (15) to twenty-five (25) years for second degree murder, a Class A felony, and eight (8) to twelve (12) years for attempted second degree murder, a Class B felony. See Tenn. Code Ann. § 40-35-112.

Within those ranges, we must start at the minimum sentence for each conviction and enhance the sentences as appropriate for any enhancement factors, and then reduce the sentences within the range for any mitigating factors. See Tenn. Code Ann. § 40-35-210(e) (Supp. 1994).

The State argues that enhancer (9), the employment of a firearm, should apply to both convictions and that enhancer (6), particularly great injuries, should apply exclusively to the attempted murder conviction. Tenn. Code Ann. § 40-35-114 (9),(6) (Supp. 1994). We agree. There is no dispute that the appellant employed a firearm during the commission of both crimes. The use of a firearm is not an element of either offense and can be considered to enhance the appellant's sentences on both convictions. See State v. Raines, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994), *per. app. denied* (Tenn. 1994).

Furthermore, we find that the injuries sustained by Ms. Arthur were particularly great. Tenn. Code Ann. § 40-35-114(6). The evidence shows that Ms. Arthur was struck by a bullet penetrating her right check bone and fracturing her eye socket. Although she underwent two corrective surgeries after the shooting, she suffered permanent nerve damage and vision impairment. Those injuries clearly exceeded the evidence necessary to convict the appellant of attempted second degree murder. Therefore, although appellant contends that the injuries were elements of the offense, we conclude that enhancer (6) should apply to the attempted murder conviction. See State v. Freeman, No. 02C01-9601-CC-00028 (Tenn. Crim. App. at Jackson, Sept. 30, 1996), *per. app. denied* (Tenn. 1997).

17

Lastly, we must address whether the record supports any mitigating factors. The appellant argues that he acted under duress and strong provocation, he suffered from a mental condition, he assisted authorities in treating the victims, he committed the offenses under unusual circumstances, substantial grounds existed to justify his conduct, and he has no prior history of criminal conduct. Tenn. Code Ann. § 40-35-113 (Supp. 1994).

From our *de novo* review, we find very little evidence to support appellant's contention. He argues, as he did at trial, that the shooting was prompted by the constant abuse and manipulation from the two victims. However, other than his own testimony, there is no evidence that his relationship with Ms. Arthur and Ms. White somehow justified his criminal conduct or reduced his culpability. Instead, the evidence as accredited by the jury, supports a finding that appellant was the aggressor who intentionally shot both victims after he had attacked Ms. Arthur earlier that evening.

Furthermore, although there was proof that the appellant attempted to obtain help after the shooting, we conclude that his actions are entitled to little, if any, weight. The evidence shows that the appellant made one phone call to 911. When he was unable to reach 911, he left both victims unassisted and went to a neighbor's house. The neighbor, Randall Sharp, testified that the appellant confessed to the shootings and promptly sat down on the couch. During that time, Ms. Arthur contacted 911 while Mr. Sharp went over to assist both her and Ms. White. There was no evidence that the appellant asked for Mr. Sharp's help or did anything further to assist the two victims. Nor do we find sufficient evidence that the appellant committed the crimes while suffering from a mental condition. The appellant testified that his relationship with the two victims became so abusive that he eventually broke down and wanted to commit suicide. However, other evidence shows that during that same time, he maintained a positive and favorable attitude at work and continued to live with

18

Ms. Arthur at their home in Anderson County. Although we acknowledge that his relationship with Ms. Arthur and Ms. White may have been difficult, we find that the appellant has failed to prove that he suffered from any condition to reduce his culpability for the crimes.

In sum, we find that the only mitigating factor is the appellant's lack of a prior criminal record. The presentence report indicates that the appellant has no prior convictions and that, despite two prior arrests for domestic violence and criminal littering, he has no history of criminal conduct. We agree that the absence of a criminal history is entitled to some consideration; however, we find that it carries little weight in this case. Based upon the nature of the offenses and injuries, and the finding of enhancement factors, we conclude that the appellant's sentences for both convictions are appropriate.

Accordingly, the judgment of the trial court is affirmed.

_____
WILLIAM M. BARKER, JUDGE


CONCUR:

_____
JOHN H. PEAY, JUDGE


_____
DAVID G. HAYES, JUDGE

19